ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

Rachel D. Martinez (FL Bar No. 1049812)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-5589
Fax: (202) 514-8865
Rachel.Martinez@usdoj.gov

*Attorney for Defendant*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALLIANCE OF NURSES FOR HEALTHY ENVIRONMENTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LEE M. ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency,<br><br>Defendant. | Case No. 4:26-cv-03118-HSG<br><br>**EPA'S COMBINED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date: June 25, 2026<br>Time: 2:00 p.m.<br>Place: Courtroom 2, 4th Floor<br>Judge: Hon. Haywood S. Gilliam, Jr. |
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LEE M. ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency,<br><br>Defendant. | Case No. 4:26-cv-03500-HSG |

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................ i

TABLE OF AUTHORITIES ........................................................ ii

INTRODUCTION ........................................................ 1

STATEMENT OF ISSUES ........................................................ 2

LEGAL AND FACTUAL BACKGROUND ........................................................ 2

I. Statutory Background ........................................................ 2

II. Factual Background ........................................................ 6

ARGUMENT ........................................................ 9

I. The Court Should Decline Jurisdiction Under the Prudential Ripeness Doctrine. ............ 9

A. Plaintiffs' Claims Are Not Fit For Decision. ........................................................ 9

B. Withholding Court Consideration Would Not Impose "Immediate, Direct, and Significant" Hardship On Plaintiffs. ........................................................ 10

II. Plaintiffs Have Not Established Standing. ........................................................ 11

A. Plaintiffs Have Not Shown Imminent Injury That Would Be Redressed By the Requested Relief. ........................................................ 12

B. Plaintiffs Have Not Established Standing for All Areas They Seek to be Designated. ........................................................ 13

III. The Remedy Proposed by Plaintiffs Exceeds the Scope of the Remedy Authorized by the CAA's Citizen Suit Provision and Is Otherwise Unreasonable. ........................................................ 14

A. EPA Does Not have a Mandatory Duty to Make Designations Effective Immediately Upon Promulgation or Issue 120-day Letters by Date Certain. ........................................................ 14

B. 150 Days to Promulgate the Designations is Unsupported and Unreasonable. ........................................................ 16

CONCLUSION ........................................................ 18

## TABLE OF AUTHORITIES

**Cases**

*Am. Lung Ass'n v. Browner*,
884 F. Supp. 345 (D. Ariz. 1994) .................... 17

*Arizona v. EPA*,
77 F.4th 1126 (D.C. Cir. 2023) .................... 12

*Ass'n of Am. Med. Colls. v. United States*,
217 F.3d 770 (9th Cir. 2000) .................... 10

*Barnhart v. Sigmon Coal Co., Inc.*,
534 U.S. 438 (2002) .................... 15

*Bishop Paiute Tribe v. Inyo Cnty.*,
863 F.3d 1144 (9th Cir. 2017) .................... 9

*Bradford v. Ogbuehi*,
No. 17-cv-01128, 2020 WL 9886194 (E.D. Cal. Feb. 20, 2020) .................... 9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................... 11

*Clean Wis. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) .................... 4, 13

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) .................... 13

*G.B. by & through G.P. v. United States Env't Prot. Agency*,
172 F.4th 1042 (9th Cir. 2026) .................... 11

*Immigrant Defs. Law Ctr. v. Noem*,
781 F. Supp. 3d 1011 (C.D. Cal. 2025) .................... 10

*Kumar v. Koester,*
131 F.4th 746 (9th Cir. 2025) .................... 11

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 11

*Municipality of Anchorage v. United States*,
980 F.2d 1320 (9th Cir. 1992) ........ 10

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*,
618 F. Supp. 3d 901 ........ 10

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ........ 9, 10

*Nat. Res. Def. Council v. Abraham*,
388 F.3d 701 (9th Cir. 2004) ........ 10

*Project Veritas v. Schmidt*,
125 F.4th 929 (9th Cir. 2025) ........ 9

*Sierra Club v. Ruckelshaus*,
602 F. Supp. 892 (N.D. Cal. 1984) ........ 17

*Stockton v. Brown*,
152 F.4th 1124 (9th Cir. 2025) ........ 10

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ........ 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 11, 13

**Statutes**

5 U.S.C. § 553(d) ........ 15

42 U.S.C. § 7401(a)(3) ........ 2

42 U.S.C. § 7401(a)(4) ........ 2

42 U.S.C. § 7407(d)(1)(A) ........ 4

42 U.S.C. § 7407(d)(1)(A)(i)-(iii) ........ 4

42 U.S.C. § 7407(d)(1)(B)(i) ........ 4, 14

42 U.S.C. § 7407(d)(1)(B)(ii) ........ 4

42 U.S.C. § 7407(d)(2)(A) ........ 4
42 U.S.C. § 7407(d)(2)(B) ........ 4
42 U.S.C. § 7408 ........ 2, 8
42 U.S.C. § 7408(a)(2) ........ 3
42 U.S.C. § 7409 ........ 2
42 U.S.C. § 7409(b) ........ 3, 7, 8
42 U.S.C. § 7409(d) ........ 7
42 U.S.C. § 7409(d)(1) ........ 3
42 U.S.C. § 7410(a)(1) ........ 3, 4
42 U.S.C. § 7410(a)(2) ........ 4
42 U.S.C. § 7411(b)(1)(B) ........ 15
42 U.S.C. § 7412(d)(10) ........ 15
42 U.S.C. § 7412(f)(3) ........ 15
42 U.S.C. § 7475 ........ 3, 4
42 U.S.C. § 7476(b) ........ 14
42 U.S.C. §§ 7501-7509 ........ 5
42 U.S.C. § 7502(c)(5) ........ 5
42 U.S.C. § 7502(e) ........ 5, 12
42 U.S.C. § 7503 ........ 5
42 U.S.C. §§ 7513-7513b ........ 5
42 U.S.C. § 7521(a)(5)(B) ........ 15
42 U.S.C. § 7604(a)(2) ........ 14
42 U.S.C. § 7607(b) ........ 3
42 U.S.C. § 7607(b)(1) ........ 4
42 U.S.C. § 7607(d) ........ 2
42 U.S.C. § 7671g(a)(1) ........ 15

**Rules**

Fed. R. Civ. P. 56 ........ 9

**Federal Registers**

44 Fed. Reg. 56730 (Oct. 2, 1979)........ 6
79 Fed. Reg. 17043 (Mar. 27, 2014)........ 5
85 Fed. Reg. 82684 (Dec. 18, 2020)........ 6
87 Fed. Reg. 22207 (April 14, 2022)........ 7
89 Fed. Reg. 16202 (Mar. 6, 2024)........ 6, 7

## INTRODUCTION

In 2021, the U.S. Environmental Protection Agency ("EPA") took the unprecedented step of "reconsidering" the National Ambient Air Quality Standards for Fine Particulate Matter ("PM2.5 NAAQS" or "Standards")—which had just been reaffirmed in 2020—without initiating or completing a "thorough review" required under the Clean Air Act. EPA finalized revisions in 2024 that slashed the standards by twenty-five percent, and a broad coalition of states and regulated parties challenged the rulemaking in the Court of Appeals for the District of Columbia. Upon further review, EPA confessed error, admitting that this novel approach was unlawful in multiple respects, and asked the D.C. Circuit to vacate the 2024 PM2.5 NAAQS. The D.C. Circuit is poised to decide whether the new standards are illegal, including whether EPA exceeded its statutory authority and whether EPA erroneously "reconsidered" existing standards without a "thorough review" of all relevant information.

The two Plaintiff groups in these cases ignore the pendency of a decision from the D.C. Circuit and in their rushed motions for summary judgment they ask this Court to direct EPA to promulgate area designations for the 2024 PM2.5 NAAQS. In Plaintiffs' view, the Standards must be implemented *this year*, judicial comity, statutory flexibilities, and administrative realities notwithstanding. Indeed, Plaintiffs hope to force designations regardless of their legality to trigger the statute's anti-backsliding provision and give them additional arguments in future cases. Because of this posture, EPA has asked this Court to hold this case in abeyance pending a decision from the D.C. Circuit regarding whether the 2024 PM2.5 NAAQS were illegally promulgated. Alternatively, this Court should determine that these cases are prudentially unripe and decline to hear the cases until there is a final decision from the D.C. Circuit.

Even if this Court were inclined to move forward with a deadline for EPA to promulgate area designations for the challenged Standards, Plaintiffs have not established their standing. Any remedy must be limited to those areas for which Plaintiffs have demonstrated standing. And even for those areas, the Court should provide EPA with the time necessary to make well-reasoned and scientifically supported designations in accordance with the statutory requirements established by Congress. As explained in the detailed declaration of Assistant Administrator

Aaron Szabo, Plaintiffs' proposed remedies—which are based on their preferred timeline rather than the work that is actually required to complete the designations—are infeasible and impossible for EPA to achieve in light of the work the Agency must undertake to complete the designations and the timelines set by Congress.

## STATEMENT OF ISSUES

1. If this Court does not grant EPA's pending motion to place this case in abeyance, whether the Court should decline jurisdiction under the prudential ripeness doctrine, where EPA has confessed error and moved to vacate the underlying Standards in the D.C. Circuit.
2. Whether Plaintiffs have established standing for their requested relief of nationwide area designations.
3. Whether the deadline in Plaintiffs' proposed remedy is impossible to achieve, in light of the steps EPA still must take to issue designations under timelines dictated by Congress balanced against the Agency's competing deadlines, and whether Plaintiffs' proposed remedies relating to the immediate effectiveness of designations and deadlines for 120-day letters to states announcing intended designations are outside the scope of the Court's jurisdiction.

## LEGAL AND FACTUAL BACKGROUND

### I. Statutory Background

*EPA's establishment and revision of NAAQS.* The Clean Air Act establishes a cooperative state and federal program to control the nation's air pollution. 42 U.S.C. § 7401(a)(3)-(4). Among other things, EPA is charged with identifying certain air pollutants that may reasonably be anticipated to endanger public health and welfare, and with formulating NAAQS that specify the maximum permissible concentrations of those pollutants in the ambient air. *Id.* §§ 7408-7409. EPA promulgates the standards in accordance with the substantive and procedural requirements of sections 109 and 307(d). *See id.* §§ 7409, 7607(d). Two sections govern the establishment and revision of the NAAQS. Section 108 directs EPA to identify and list certain air pollutants that endanger public health and then issue air quality criteria for those pollutants. *Id.* § 7408. Air quality criteria must "accurately reflect the latest scientific knowledge

useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of [a] pollutant in the ambient air, in varying quantities." *Id.* § 7408(a)(2). Then, section 109 directs the Administrator to propose and promulgate "primary" (health-based) and "secondary" (welfare-based) NAAQS "based on such criteria" for the relevant pollutants. *Id.* § 7409(b). Section 109(b) defines primary standards as standards "the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health." *Id*. This provision also states that primary standards "may be revised in the same manner as promulgated." *Id.*

Congress amended the statute in 1977 to specify that EPA must periodically review the standards in a particular way and revise, as appropriate, based on the outcome of that process. More specifically, under section 109(d)(1), EPA must complete a "thorough review" of the underlying air quality criteria and related NAAQS "at five-year intervals." *Id.* § 7409(d)(1). After completing this review, EPA "shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section [108] and subsection (b) of [section 109]." *Id.* EPA "may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph," *id.,* meaning that EPA is not precluded from completing a thorough review and revising the standards, if appropriate, before the five-year mark. EPA's regulatory decision at the close of the five-year cycle is subject to review in the D.C. Circuit. *Id.* § 7607(b).

*Implementation of NAAQS*. Revising a standard triggers various actions and obligations for states, EPA, and regulated parties. As of the revision's effective date, permit applicants (including those with pending applications) must demonstrate that any new or modified major stationary source will not cause, or contribute to, a violation of the standard. *Id.* § 7475. Within three years, states must submit revised plans that provide for implementation, maintenance, and enforcement of the standard. *Id.* § 7410(a)(1).

With respect to the designation process at issue in this case, within one year of promulgation, states must identify and submit to EPA a list of areas with their initial designations for such areas. *Id.* § 7407(d)(1)(A). The CAA establishes three designations:

- "nonattainment": areas that do not meet the NAAQS, and areas that contribute to a violation of the NAAQS in a nearby area;
- "attainment": areas that meet the NAAQS; and
- "unclassifiable": areas in which available information is insufficient to determine whether the NAAQS is met.

*Id.* § 7407(d)(1)(A)(i)-(iii).

Next, EPA must promulgate the designations within two years from promulgation of the new or revised NAAQS. *Id.* § 7407(d)(1)(B)(i). EPA may extend this period for up to one year in the event EPA determines it lacks sufficient information to promulgate the designations. *Id.*

In promulgating designations, EPA is authorized to make any modifications "the Administrator deems necessary" to a state's initial designations. *Id.* § 7407(d)(1)(B)(ii). However, if EPA modifies a state's initial designation, EPA must provide the state with at least 120 days' notice and an opportunity to demonstrate why EPA's proposed modification is inappropriate before promulgating the final designation. *Id.* In addition, if a state fails to submit a list of recommended designations, in whole or in part, EPA must promulgate designations that EPA "deems appropriate for any area (or portion thereof) not designated by the State." *Id.*

EPA must publish a notice in the *Federal Register* to promulgate the final designations. *Id.* § 7407(d)(2)(A). The Act provides that EPA should issue area designations through "notice and comment whenever possible." *Id.* § 7407(d)(2)(B). Indeed, EPA almost always provides notice and an opportunity for comment to promulgate designations to better understand potential area-specific issues and promote regulatory certainty. Final area designations are subject to judicial review. *Id.* § 7607(b)(1); *see, e.g.*, *Clean Wis. v. EPA*, 964 F.3d 1145, 1157 (D.C. Cir. 2020) (involving challenges to certain designations under 2015 ozone NAAQS).

A state's duties in implementing a NAAQS in an area vary depending upon the designation. As long as an area remains undesignated, or is designated "attainment" or

"unclassifiable," the state's duties are limited to developing a "state implementation plan" ("SIP") that provides for basic implementation, maintenance, and enforcement of the new or revised NAAQS. 42 U.S.C. § 7410(a)(1)-(2). These SIP submissions are commonly called "infrastructure SIPs," and states are required to submit them no later than three years after promulgation of a new or revised NAAQS to meet SIP requirements that apply statewide and regardless of designation status. *Id.*; *see, e.g.*, 79 Fed. Reg. 17043 (Mar. 27, 2014) (Approval and Promulgation of Air Quality Implementation Plans; Virginia; section 110(a)(2) Infrastructure Requirements for the 2008 Ozone National Ambient Air Quality Standards). In addition, certain permitting requirements for new sources apply upon the effective date of the new or revised NAAQS, without awaiting any designations. 42 U.S.C. § 7475. As long as an area remains undesignated or is designated "attainment" or "unclassifiable," those permitting requirements remain applicable.

If a state has an area that is designated "nonattainment," then additional planning requirements become applicable. In the case of PM2.5 NAAQS nonattainment areas classified as Moderate, states are directed to adopt and submit for EPA approval nonattainment plan SIPs meeting applicable requirements and demonstrating how the area will be brought into attainment with the NAAQS as expeditiously as practicable, but not later than the end of the sixth calendar year following designation. *See* CAA sections 171-179 and 188-190, 42 U.S.C. §§ 7501-7509 and 7513-7513b. Such plans must include additional permitting requirements under "nonattainment" new source review that applies in lieu of prevention of significant deterioration permitting. *Id.* §§ 7502(c)(5), 7503.

Thus, the Act contemplates that designations implementing a revised standard involves a long and resource-intensive process. And once an area is designated nonattainment, EPA cannot "rela[x]" the applicable NAAQS unless it promulgates controls "not less stringent than the controls applicable to areas designated nonattainment before such relaxation." *Id.* § 7502(e). For that reason, the statute's textual requirements for revising the NAAQS bear particular importance.

**II. Factual Background**

EPA first promulgated standards for particulate matter in 1971 and has completed five thorough reviews to date under section 109(d)(1). Ex. A, Szabo Decl. ¶¶ 8-21[1]. In 1997, EPA decided to maintain separate criteria and standards for fine particulate matter, PM2.5, and coarse particulate matter, PM10. *Id.* ¶ 12. Across five decades, EPA consistently adhered to the position that any revised standard "necessarily entails the thorough additional review of criteria as contemplated in Section 109(d)(1) of the Clean Air Act" and "would be based on, and announced concurrently with, the final revised criteria document." 44 Fed. Reg. 56730, 56731 (Oct. 2, 1979) (initiating first review). Until 2024, EPA had never revised the particulate matter standards without relying on its section 109(d)(1) authority and completing a thorough review of the air quality criteria. Ex. A, Szabo Decl. ¶¶ 36, 38.

Since 2008, EPA has completed the thorough review of air quality criteria by drafting and finalizing an Integrated Science Assessment that examines peer reviewed literature, published since the previous review cycle, on all identifiable effects of the pollutant on public health or welfare. 89 Fed. Reg. 13202, 16207-08 (Mar. 6, 2024). In 2020, EPA completed a thorough review of the PM criteria and standards, which included reviewing an Integrated Science Assessment completed in 2019 ("2019 Assessment"), and issued a final decision explaining that the Administrator would retain the existing primary and secondary PM10 and PM2.5 standards. 85 Fed. Reg. 82684 (Dec. 18, 2020) ("2020 Rule"). That decision was therefore based on the available scientific evidence and data pertinent to the air quality criteria, as well as the Advisory Committee's advice and public comment. *Id*. In January 2021, Executive Order 13990 (now rescinded) ordered a review of the 2020 Rule. Ex. A, Szabo Decl. ¶ 22. A few months later, EPA announced that it would undertake a limited "reconsideration" of the 2020 Rule focused on key scientific topics. *Id*. ¶ 23. To that end, the agency developed a "supplement" to the 2019 Assessment ("2022 Supplement") and a revised policy assessment. *Id*. The 2022

---

[1] Exhibit A was originally attached to EPA's motion to vacate in the D.C. Circuit. *See Kentucky v. EPA*, No. 24-1050, Dkt. No. 2147050 (D.C. Cir.). Exhibit C is a separate declaration by Assistant Administrator Szabo in support of this opposition.

Supplement selected and analyzed several new studies on a targeted basis covering only part of the scientific literature supporting the 2020 Rule. 87 Fed. Reg. 22207 (April 14, 2022).

EPA admitted that the 2022 Supplement did not "represent [a] full multidisciplinary evaluation of evidence" for the underlying air quality criteria, *see id.*, and that it did not "satisfy the EPA's obligation to periodically complete a thorough review of the air quality criteria." 89 Fed. Reg. at 16212. EPA explained that there were other effects related to the air quality criteria, such as respiratory effects, reproductive and developmental effects, and nervous system effects, that were not updated in this partial reconsideration of the 2020 thorough review. *Responses to Significant Comments on the 2023 Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, Docket Number OAR-2015-0072 at 73, 121]. Instead, EPA purported to evaluate a limited set of new studies, in conjunction with the full body of information from the 2019 Assessment, to inform its partial reconsideration. *Id.* at 121; *see also* 89 Fed. Reg. at 16213.

The result of this targeted "reconsideration" was a fundamental change to the 2020 Rule's conclusion. EPA determined that the annual primary PM2.5 standard was inadequate and lowered it in the 2024 PM 2.5 NAAQS by twenty-five percent. *Id*. at 16203. Many states and regulated parties challenged the Standards in petitions for review brought in the D.C. Circuit Court of Appeals. *Kentucky v. EPA*, No. 24-1050 (and consolidated cases) (D.C. Cir.). Numerous parties intervened to defend the 2024 PM2.5 NAAQS approach, including Plaintiffs here. EPA initially defended the rule, arguing that the second sentence of section 109(d)(1) independently authorizes EPA to revise a NAAQS at any time without first initiating and completing the thorough review required under the first sentence of section 109(d)(1). At oral argument, the panel proposed a different source of standalone revision authority, located in section 109(b). *See* 42 U.S.C. § 7409(b), (d). That provision was not the basis asserted in the rule, and EPA has never attempted to bypass section 109(d)(1) by relying solely on section 109(b). Ex. A, Szabo Decl. ¶ 40. To view section 109(b) that way contradicts decades of agency practice and improperly reads section 109(d)'s requirements out of the statute.

Oral argument was held in December 2024, and the litigation was held in abeyance following the change in administration and during the Fall 2025 lapse in appropriations. Upon further consideration, EPA concluded that the position it advanced earlier was erroneous. As EPA explained in its motion to vacate the Standards in the D.C. Circuit, the best reading of section 109(d)(1) is that EPA must complete a thorough review of the underlying criteria and corresponding standards before deciding to revise a standard. That follows from the text of section 109(d)(1) and its surrounding provisions, including section 108, which requires that criteria reflect the "latest scientific knowledge," and section 109(b), which provides that standards are "based on" the underlying criteria. *See* 42 U.S.C. §§ 7408, 7409(b). Revising a standard without a full review of the underlying criteria or related standards is not a thorough review. Moreover, the second sentence of 109(d)(1) must be read in context with the first and cannot dispense with the thorough review requirement for revising a standard.

Because EPA based its action on an erroneous interpretation of the statute and exceeded its authority by revising the standard without initiating and completing a thorough review, EPA confessed error in the D.C. Circuit proceedings and moved that court to vacate the Rule. *Kentucky v. EPA*, No. 24-1050, Doc. 2147050 (D.C. Cir.). EPA also admitted that, even under the "discretionary reconsideration" theory, it acted unreasonably by refusing to consider the costs associated with undertaking such a revision mid-cycle. EPA requested that the D.C. Circuit act before the area designation deadline of February 7, 2026. *Id.* at PDF Page 7.

The non-governmental organization Plaintiffs ("NGO Plaintiffs") filed their CAA citizen suit complaint on April 13, 2026, and the governmental Plaintiffs ("State Plaintiffs") filed their related CAA citizen suit on April 24, 2026. Compl., No. 4:26-cv-03118-HSG, Dkt. No. 1 ("NGO Compl."); Compl., No. 4:26-cv-03500-HSG, Dkt. No. 1 ("State Compl.") Both Plaintiff groups promptly filed motions for summary judgment, before EPA's deadline to respond to the complaints.[2] Both Plaintiff groups request that the Court order EPA to promulgate designations

[2] Although Rule 56(b) allows a motion for summary judgment to be filed as early as the commencement of an action, "in many cases the motion will be premature until the nonmovant

of all areas of the country in time for there to be publication in the *Federal Register* within 150 days of the Court's order. *See* NGO Mot. at 2, Dkt. No. 16; *see also* States Mot. at 22, Dkt. No. 40.

## ARGUMENT

### I. The Court Should Decline Jurisdiction Under the Prudential Ripeness Doctrine.

"Ripeness" is one of the justiciability doctrines courts use to decide whether a case presents a live controversy. The doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ." *Project Veritas v. Schmidt*, 125 F.4th 929, 941 (9th Cir. 2025) (en banc) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted). The issue of prudential ripeness is presented here because of the pending judicial challenges to the 2024 PM 2.5 NAAQS and EPA's confession of error and request for vacatur of the NAAQS. Indeed, the D.C. Circuit is expected to decide the validity of the NAAQS at any time, and this Court should exercise its discretion to find this matter is not prudentially ripe.

The prudential ripeness inquiry is "guided by two overarching considerations: the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1154 (9th Cir. 2017) (internal quotations omitted).[3] Both considerations favor dismissing Plaintiffs' claims without prejudice.

#### A. Plaintiffs' Claims Are Not Fit For Decision.

A claim is fit for decision "if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (citation omitted). In contrast, a claim is unfit for decision where "further factual development would significantly advance [the Court's] ability to deal with the

---

has had time to file a responsive pleading or other pretrial proceedings have been had." Fed. R. Civ. P. 56 Advisory Committee Notes 2010 Amendment. *See also Bradford v. Ogbuehi*, No. 17-cv-01128, 2020 WL 9886194, at *1 (E.D. Cal. Feb. 20, 2020).

[3] The Ninth Circuit has affirmed that, regardless of any questions about the continuing vitality of the prudential ripeness doctrine, the doctrine "remains viable" and the court remains bound by its prudential ripeness precedent. *Stockton v. Brown*, 152 F.4th 1124, 1148-49 (9th Cir. 2025).

legal issues presented[.]" *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 912 (N.D. Cal. 2022) (citation modified) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. at 812). Here, there is indisputable uncertainty as to the legal status of the Standards Plaintiffs rely on for their claims concerning EPA's duty to promulgate designations. Further factual development—in the form of a decision by the D.C. Circuit as to the validity of the 2024 Rule—is essential to advance this Court's decision as to whether Plaintiffs are entitled to any relief whatsoever. *Cf. Stockton*, 152 F.4th at 1150 (citing future proceedings that had not yet concluded as a basis for finding a claim unfit for decision).

As set forth in the Factual Background above, many states not represented here petitioned for review of the 2024 Rule and raised serious questions as to the legality of the Rule. And after the oral argument and further reconsideration, EPA agreed that it revised the PM2.5 NAAQS without initiating and completing a thorough review, and that it failed to consider an important aspect of the problem by not considering the costs associated with making such a revision to the standards in mid-cycle. The D.C. Circuit—the court with exclusive original jurisdiction to consider the questions raised in the petitions for review of the Rule—is poised to act on the matter. This Court should withhold consideration of Plaintiffs' claims while the petitions for review are resolved.

### B. Withholding Court Consideration Would Not Impose "Immediate, Direct, and Significant" Hardship On Plaintiffs.

In motions seeking dismissal based on prudential ripeness, the burden is on the plaintiff to show that postponing judicial resolution of their claim "imposes a hardship on them 'that is immediate, direct, and significant.'" *Immigrant Defs. Law Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1040 (C.D. Cal. 2025) (quoting *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1326 (9th Cir. 1992). And in the context of prudential ripeness, "hardship" means "hardship of a legal kind, or something that imposes a significant practical harm upon the plaintiff." *Nat. Res. Def. Council v. Abraham*, 388 F.3d 701, 706 (9th Cir. 2004); *see also Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 783 (9th Cir. 2000) (citing agency action that imposes an "immediate dilemma"). As explained in EPA's motion to hold these matters in abeyance,

Plaintiffs cannot show any immediate hardship. *See* EPA Reply to NGO Opp., Dkt. No. 40 at 3; EPA Reply to State Opp., Dkt. No. 44 at 3-4.

Plaintiffs' purported harms are years in the future, take the form of potential foregone benefits in certain areas of the country, and turn on multiple contingent future actions by EPA, states, and state and local permitting authorities, as well as courts of competent jurisdiction authorized to review actions taken under the detailed statutory and regulatory process for implementation of the NAAQS.

Because these citizen suits should not proceed in light of the pending decision by the D.C. Circuit on the legality of the 2024 PM2.5 NAAQS, and because Plaintiffs' purported harms are neither immediate nor direct and significant, this Court should decline jurisdiction under the prudential ripeness doctrine.

**II. Plaintiffs Have Not Established Standing.**

Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies'. . . ." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 559 (1992). For that reason, Plaintiffs must establish standing for each area for which they seek an order to compel a designation. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)*; Kumar v. Koester,* 131 F.4th 746, 751 (9th Cir. 2025) (requiring standing for each claim). To do so, Plaintiffs must show an actual or imminent injury in fact that is both fairly traceable to EPA's alleged failure to take mandatory action and redressable by the requested relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)*; G.B. by & through G.P. v. United States Env't Prot. Agency*, 172 F.4th 1042, 1054, 1058 (9th Cir. 2026). For those who are not the object of designations, "standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S at 562 (internal quotation marks omitted). Here, Plaintiffs' declarations fail to show standing in several respects.

**A. Plaintiffs Have Not Shown Imminent Injury That Would Be Redressed By the Requested Relief.**

Plaintiffs fail to allege an actual or imminent injury that is certainly impending, traceable to a delay in designations, or redressable by an order compelling designations before the legality of the 2024 PM2.5 NAAQS is resolved.

As an initial matter, both the NGO and State Plaintiffs assert procedural injury in the form of being unable to participate in the public processes that often accompany NAAQS implementation. NGO Mot. at 12; State Mot. at 13. Such assertions are wholly at odds with their requested relief, which would preclude any meaningful public process on designations and foreclose any warranted extensions that would result in missing their preferred calendar year attainment date.

Further, Plaintiffs' rushed request for an order requiring designations that would become effective on or before December 31, 2026 suggests the injury Plaintiffs actually wish to address: the threat to any argument they may advance in the future regarding the Clean Air Act's anti-backsliding provision. Section 172(e) provides that if EPA relaxes a NAAQS, EPA must promulgate requirements for areas that have not attained the relaxed standard, and that the requirements "shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation." 42 U.S.C. § 7502(e). That is not a cognizable Article III injury, and this Court need not bend ordinary standing rules in order to accommodate it.

Equally unavailing is the State Plaintiffs' assertion that any delay in designations prevents their ability to further public health within their borders. State Mot. at 12-13. But states do not need to wait for any of the areas in their borders to be designated nonattainment to take additional steps under the existing PM NAAQS and applicable state law to protect public health. *See Arizona v. EPA*, 77 F.4th 1126, 1127 (D.C. Cir. 2023) (holding no standing where states remained free to enforce a revised standard on an existing schedule rather than taking an extension). Nor have the State Plaintiffs provided legal or factual support for their contentions, State Mot. at 13, that designations are required before they can apply for or obtain any particular

grant funding, that they cannot apply due to the lack of designations, or that they have tried to apply but been refused. And the State Plaintiffs' "proprietary" arguments, citing to alleged future increased healthcare costs and impacts from downwind states, *id.* at 13-14, are speculative and undefined in terms of purported loss of funding, diversion of resources, or degradation of data.

**B. Plaintiffs Have Not Established Standing for All Areas They Seek to be Designated.**

The NGO Plaintiffs assert standing on behalf of their members to compel EPA to promulgate designations for all areas of the country. Dkt. No. 1 ¶¶ 51-58. They provide declarations by members of the various NGOs asserting that they live, work, and/or recreate in various counties that EPA would designate. *See* Dkt. Nos. 16-12 – 16-68. But those declarations do not cover all areas of the country. As shown in the attached table, these declarations do not show that the organizations' members live, work, or recreate in many counties for which they seek designations. *See* Ex. B, Counties or Areas Referenced in NGO Plaintiffs' Declarations. Thus, the NGO Plaintiffs have not shown their members would be injured by a failure to designate those other areas not identified in the declarations. *Cf. Clean Wis.*, 964 F.3d at 1157 (holding that environmental organizations failed to provide evidence of members purportedly injured by EPA's CAA area designations for specific counties).

Likewise, it is not enough for the NGO Plaintiffs to broadly assert that they have members in all states and the District of Columbia. *See, e.g.*, Dkt. No. 16-55 ¶ 4 (Olinger Decl.); Dkt. No. 16-64 ¶ 6 (Stith Decl.). Plaintiffs must demonstrate standing for each claim "with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC*, 594 U.S. at 431 (first citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008); and then quoting *Lujan*, 504 U.S. at 561). As shown in Exhibit A, organizations may have a member in only one area of a state.

As for the NGO Plaintiffs' assertion of standing in the organizations' own rights, their injury is similarly limited to those areas in which the organizations have members. The declarations of organizational representatives demonstrate that their advocacy and other actions are taken specifically on behalf of their members. *See, e.g.*, Dkt. Nos. 16-32 ¶ 11 (Fox Decl.), 16-

38 ¶¶ 5, 10-11, 13-14 (Jameson Decl.). And where the organizations' efforts may be more broadly focused, the declarations do not show that the failure to promulgate designations has harmed such interests. *See, e.g.,* Dkt. No. 16-21 ¶ 3 (Benjamin Decl.) (describing advocacy); Dkt. No. 16-26 ¶ 2 (Collishaw Decl.) (describing research and education).

Finally, the State Plaintiffs provided declarations from officials in only three of the States and one county in Texas. *See* Dkt. Nos. 40-1 – 40-4 (Declarations from officials in California, Massachusetts, Oregon, and Harris County, Texas). As noted above, a plaintiff cannot rest upon the allegations in its complaint at the summary judgment stage. Instead, it must "set forth by affidavit or other evidence specific facts" that support a finding of standing. *Lujan*, 504 U.S. at 555. To the extent the State Plaintiffs have shown injury, it is limited to the three States and Harris County, Texas.

For these reasons, any remedy issued must be limited to those areas in which Plaintiffs have established standing.

## III. The Remedy Proposed by Plaintiffs Exceeds the Scope of the Remedy Authorized by the CAA's Citizen Suit Provision and Is Otherwise Unreasonable.

### A. EPA Does Not have a Mandatory Duty to Make Designations Effective Immediately Upon Promulgation or Issue 120-day Letters by Date Certain.

NGO Plaintiffs request that the Court order EPA to promulgate "immediately effective" designations for all areas. In their complaint, NGO Plaintiffs invoke this Court's jurisdiction under the second section of the citizen suit provision of the CAA, which waives sovereign immunity only for failures to perform non-discretionary duties. NGO Compl. ¶ 7 (citing 42 U.S.C. § 7604(a)(2)). No Plaintiff alleges that EPA is under a discrete, nondiscretionary duty to promulgate designations that are immediately effective. Nor did any Plaintiff request that the Court order EPA to select any particular effective date in their complaints. Rather, Plaintiffs allege that EPA failed to perform a mandatory duty to promulgate designations for the 2024 PM2.5 NAAQS and requested that the Court require EPA to perform that duty. NGO Compl. at 15, ¶ 60 (citing to 42 U.S.C. § 7407(d)(1)(B)(i)); State Compl. at 16, ¶ 57 (citing to 42 U.S.C. § 7407(d)(1)(B)(i)). The Clean Air Act does not specify an effective date for designations.

In contrast, other Clean Air Act provisions do require specific effective dates for other actions. 42 U.S.C. §§ 7476(b) ("effective one year after the date of promulgation"), 7521(a)(5)(B) ("shall not become effective until the introduction of the model year . . ."), 7671g(a)(1) ("effective not later than July 1, 1992"), 7671g(a)(2) ("effective not later than 12 months after promulgation of the regulations"). Several Clean Air Act provisions require that regulations become "effective upon promulgation." *Id.* §§ 7411(b)(1)(B), 7412(d)(10), 7412(f)(3). The provision at issue in this case does not. This omission is significant because when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) (internal citations and quotation marks omitted). Thus, the only mandatory duty at issue here is EPA's duty to promulgate designations, and NGO Plaintiffs have not provided any basis for their request that the Court order EPA to make the designations effective immediately.

Similarly, EPA does not have a nondiscretionary duty to issue 120-day letters to states. And Plaintiffs' Complaints do not allege that EPA has failed to issue the 120-day letters. The CAA confers upon EPA the discretion to decide whether modification of a state's recommended designations is "necessary," and thus discretion of whether to issue the letters, and which states to issue the letters to, so long as the state recipient has 120 days between receipt of the letter and promulgation of the final designation at issue. NGO Plaintiffs cannot invoke jurisdiction under the citizen suit provision to compel action on EPA's discretionary duty to issue 120-day letters.

Even assuming that this Court has authority to require a specific effective date or a deadline to issue 120-day letters, Plaintiffs have not shown that such an order would be appropriate. If EPA promulgates the designations with an effective date at a time other than the end of a calendar year, the Agency anticipates that it would establish an effective date of 30 to 60 days following promulgation in the *Federal Register*. Ex. C, Szabo Decl. ¶ 42. That is consistent with the Administrative Procedure Act's general requirement that rules issued through notice-and-comment rulemaking are effective no earlier than 30 days after publication. 5 U.S.C. § 553(d). And notably, State Plaintiffs do not ask this Court to require EPA to make designations

effective immediately on promulgation. *See* State Mot. at 22. In prior PM2.5 NAAQS Designations, EPA has implemented a later effective date to provide states with an opportunity to submit and certify an additional calendar year of monitoring data early, if it would materially affect the designation of an area. Ex. C, Szabo Decl. ¶ 40. This allows states to save resources on unnecessary nonattainment planning processes, if the state can show that new monitoring data indicates that the area is in attainment before the effective date of the designation.

**B. 150 Days to Promulgate the Designations is Unsupported and Unreasonable.**

Plaintiffs propose a schedule under which EPA will promulgate designations within 150 days of the Court's order via publication in the *Federal Register*. NGO Mot. at 25; State Mot. at 22. But Plaintiffs' proposed schedule wholly disregards the substantive efforts involved in promulgating designations. As explained in detail in the declaration of Assistant Administrator Aaron Szabo filed in support of EPA's proposed remedy, there are certain steps in the designation process that would be necessary in order to complete the designations. Ex. C, Szabo Decl. ¶¶ 18-29. These steps are:

1. Initial Review of State Designations Recommendations and Subsequently Submitted Relevant Information
2. EPA Independent Factual Analysis for States with No Designations Recommendations
3. Preparation of Draft Technical Support Documents.
4. Internal Agency Discussion/Review of Draft Technical Support Documents first within headquarters and then coordinated throughout the regions (at staff level, then at management level)
5. Revision of Draft Technical Support Documents as necessary
6. Preparation and Initial Review of Electronic Documents Related to the Intended Designations
7. Legal Review of Draft *Federal Register* Notice and Draft Technical Support Documents and 120-Day Notification Letters

8. Additional Management Review of Draft Technical Support Documents, 120-Day Notification Letters, and *Federal Register* Notice
9. Signature of 120-Day Notification Letters by Regional Administrators and of the *Federal Register* Notice by the Assistant Administrator for OAR
10. Intended Designations *Federal Register* Notice Transmittal to the Office of *Federal Register*
11. Office of *Federal Register* Publication
12. 120-Day Notification Period and Public Comment Period
13. Comment Review and Response to Comment and Final Technical Support Document Drafting
14. Final Designations Action Drafting
15. Final Routing for Signature

Plaintiffs' proposed timeline would compress the requisite steps in the designation process such that it would be infeasible for EPA to adequately consider the technical issues inherent in promulgating designations or support those designations if challenged. *See Am. Lung Ass'n*, 884 F. Supp at 347 ("the equity court will 'not embrace enforcement…of a party's duty to comply with an order that calls on him 'to do an impossibility.'") (citing *Sierra Club v. Ruckelshaus*, 602 F. Supp. 892, 898-99 (N.D. Cal. 1984)). For example, Plaintiffs ignore the substantial analytical effort involved in developing the technical support documents and 120-day letters, as well as the time necessary to consider the public comments and additional technical data EPA anticipates receiving from stakeholders and states in response to any intended designations or 120-day letters. Ex. C, Szabo Decl. ¶¶ 22-27. Plaintiffs' proposed deadline is especially impossible in light of the fact that EPA has not issued any 120-day letters or proposed or designations yet.

Plaintiffs' proposed remedy is also infeasible because it asks that the Court order EPA to "publish" in the *Federal Register* the designations within 150-days of the Court's order. NGO Mot. at 25, State Mot. at 22. However, EPA has no control over the publication schedule at the Office of the *Federal Register*. EPA can only control when the Agency signs the final rule

setting forth final designations decisions and sends that final rule to the Office of the *Federal Register*. *See* Ex. C, Szabo Decl. ¶¶ 24-25. Once EPA sends the notice to the Office of the *Federal Register*, it is out of the Agency's control. And while rules are typically published within 10 business days of transmission to the Office of the *Federal Register*, this timeline ultimately is not within the control of EPA. *See* Ex. C, Szabo Decl. ¶ 25. Accordingly, it is unreasonable to require EPA to "publish" the designations by a date certain.

Because there is uncertainty as to the validity of the Standards and Plaintiffs' standing, EPA cannot propose a timeline at this early point in this litigation. In the event these uncertainties are resolved in Plaintiffs' favor, EPA will provide the Court with a proposed remedy at that time.

**CONCLUSION**

In the event the Court does not hold this matter in abeyance, the Court should decline jurisdiction for lack of prudential ripeness and dismiss the complaints without prejudice.

In the event the Court decides to impose a deadline on EPA to promulgate area designations, any order must be limited to those areas for which Plaintiffs have established standing. And only in the event the validity of the Standards and Plaintiffs' standing are resolved in Plaintiffs' favor should the Court direct further briefing as to the deadline for EPA action.

Dated June 1, 2026 Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/ Rachel D. Martinez*
Rachel D. Martinez (FL Bar No. 1049812)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-5589
Fax: (202) 514-8865
Rachel.Martinez@usdoj.gov

*Attorney for Defendant*

Of Counsel:

Karen Bianco
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460